## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| D'ALAN E. BAUGH, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Case No. SAG-17-1735 |
| | * | |
| THE FEDERAL SAVINGS BANK, | * | |
| | * | |
| Defendant. | * | |
| | * | |

*************

## <u>MEMORANDUM OPINION</u>

This matter concerns a Motion to Certify Class pursuant to Rule 23 of the Federal Rules of Civil Procedure ("the Motion"). ECF 37. In their Complaint, D'Alan E. Baugh and Penny Frazier (collectively "Plaintiffs") seek to represent a class of borrowers that "currently have or had a federally related mortgage loan" serviced by Defendant, The Federal Savings Bank ("TFSB"). ECF 1 ¶ 1. However, after the Motion was filed, Frazier withdrew as class representative. ECF 46 at 1 n.1. TFSB opposed the Motion, ECF 46, and Plaintiffs filed a Reply, ECF 47. A telephonic hearing was held on September 8, 2020. For the reasons that follow, the Motion, ECF 37, will be GRANTED in part and DENIED in part, without prejudice.

### I.   FACTUAL BACKGROUND

Baugh seeks to represent a class of borrowers that (1) have or had a loan originated or brokered by TFSB, and (2) received title and settlement services in connection with the closing of the loan from Genuine Title, LLC ("Genuine Title"). ECF 1 ¶ 1. In March 2013, Baugh obtained a residential mortgage loan to refinance his property from TFSB's Columbia, Maryland branch, which was managed by Chris Infantino. *Id.* ¶ 63. Plaintiffs allege that TFSB referred Baugh to Genuine Title for settlement services, pursuant to an undisclosed agreement to refer its customers to Genuine Title in exchange for free cash, marketing materials, or marketing credits. *Id.* ¶ 67.

Baugh used and paid for services from Genuine Title, based on TFSB's recommendation. *Id.* ¶ 68. Plaintiffs assert that Baugh's payments to Genuine Title were shared in part with TFSB, in violation of the Real Estate Settlement Procedures Act ("RESPA"). *Id.* Plaintiffs claim that, because of this kickback arrangement, Baugh paid Genuine Title more for settlement services than he otherwise would have paid. *Id.* ¶ 81.

Plaintiffs provide additional details about the alleged Genuine Title kickback scheme in their Complaint. They allege that Brandon Glickstein — who previously worked for Genuine Title — created multiple business entities that could facilitate Genuine Title's kickback arrangements. Glickstein formed Brandon Glickstein, Inc. ("BGI") as a conduit for Genuine Title to make referring cash payments. *Id.* ¶¶ 22-23. Glickstein also formed Competitive Advantage Media Group ("CAM") to facilitate kickback payments, and to offer free marketing materials to lenders, in exchange for referrals. *Id.* ¶¶ 27-29. Plaintiffs allege that credits were awarded monthly based on how many loans were referred. *Id.* ¶¶ 33-36. Glickstein previously testified that ninety percent of loans serviced by Genuine Title from 2009 to 2014 were tied to some kind of kickback agreement. ECF 37-4 at 43:4-13. It was Genuine Title's "business practice." *Id.* at 12:5-11. Plaintiffs have identified over one thousand TFSB loans serviced by Genuine Title during that time period, seventy-seven percent of which originated from Chris Infantino's Columbia branch. ECF 37-1 at 18; ECF 47 at 8 n.4.

Jay Zukerberg, former president of Genuine Title, specified that Chris Infantino received marketing credits in exchange for referrals to Genuine Title. ECF 37-11: ¶¶ 5-7. Indeed, business records from CAM show invoices for services to Infantino and another TFSB branch manager, with the notation "credits applied." ECF 37-10. Plaintiffs believe these "credits" are marketing credits that were obtained in exchange for borrower referrals.

Plaintiffs allege Genuine Title later expanded its kickback arrangement with TFSB, beyond the marketing credits, by entering into a "sham" Title Services Agreement ("TSA"). ECF 47 at 7. In order to continue their relationship, TFSB required Genuine Title to become an "approved vendor." ECF 37-1 at 12. To be on the "approved vendor list," TFSB required Genuine Title to sign a TSA. *Id.* Genuine Title and TFSB executed a TSA on May 22, 2013, which outlines services that TFSB would provide to Genuine Title, in exchange for $175 for every loan processed. ECF 1-5 at 134:15-135:1; ECF 37-12. Some of these services, like "electronic data entry," appear to be services TFSB employees are trained to and regularly provide in real estate transactions, whether or not a TSA is in place. *See* ECF 46-11 to ECF 46-19 (affidavits of TFSB employees). Plaintiffs claim the TSA was merely a convenient way to conceal kickbacks, and they present statements from Zukerberg that assert TFSB never performed the services described in the TSA, but still received $175 per loan referred to Genuine Title. ECF 37-2 at 149-150; ECF 37-11 at ¶¶ 8-11. Zukerberg has previously admitted that once officials started investigating his business practices, he created and backdated similar written agreements with other institutions in order to make the kickback payments appear legitimate. ECF 46-1 at 45:11-46:21.

Prior to this motion, United States District Judge Richard D. Bennett granted TFSB's Motion to Dismiss this action. ECF 16; 2018 WL 638252 (D. Md. Jan. 31, 2018). Judge Bennett found that the one-year statute of limitations barred Plaintiffs' RESPA claims, and further concluded that equitable tolling could not salvage the claims. 2018 WL 620456, at *9. However, the United States Court of Appeals for the Fourth Circuit reversed on appeal. *Edmondson v. Eagle National Bank*, 922 F.3d 535, 558 (4th Cir. 2019). Primarily, the Fourth Circuit found that Plaintiffs had sufficiently alleged that TFSB engaged in affirmative acts of concealment, and thus

the one-year statute of limitations might be tolled based on a theory of fraudulent concealment. *Id.* at 551–58. The panel remanded for further proceedings.

Plaintiffs now seeks certification of the following class of individuals who allegedly suffered harm under RESPA, 12 U.S.C. § 2607, as a result of the alleged kickback scheme TFSB engaged in with Genuine Title:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by The Federal Savings Banks for which Genuine Title provided a settlement service, as identified in Section 1100 on the HUD-1, between January 1, 2009 and December 31, 2014. Exempted from this class is any person who, during the period of January 1, 2009 through December 31, 2014, was an employee, officer, member and/or agent of The Federal Savings Bank, Genuine Title LLC, Competitive Advantage Media Group LLC, Brandon Glickstein, Inc., and/or Dog Days Marketing, LLC.

ECF 37 at 1.

## II.   LEGAL STANDARD

The "class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). Class actions are subject to Federal Rule of Civil Procedure 23(a), which requires that (1) the alleged class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the representatives' claims are typical of the claims of the class, and (4) the representatives will fairly and adequately protect the interests of the class. The party seeking certification carries the burden of demonstrating that it has complied with Rule 23. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014). The four requirements of Rule 23(a) — numerosity, commonality, typicality, and adequate representation — limit the class claims to those fairly encompassed by the named plaintiff's claims. *Dukes*, 564 U.S. at 349.

After satisfying the Rule 23(a) prerequisites, the plaintiff must show that the proposed class action satisfies one of the enumerated conditions in Rule 23(b).  *E.g.*, *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003).  Here, Plaintiffs seek class certification pursuant to Rule 23(b)(3).  Under that rule, a class may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Courts evaluating class certification "must rigorously apply the requirements of Rule 23." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998).  Although the court's analysis must be "rigorous" and "may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Ct. Retirement Plans and Trust Funds*, 568 U.S. 455, 465-66 (2013) (citation omitted) (quoting *Dukes*, 564 U.S. at 351).  The merits may be considered only to the extent that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.  *Id.* at 466.

## III.   ANALYSIS

### A.  Standing

As a preliminary matter, TFSB asserts that the Plaintiffs have not suffered a concrete injury and therefore lack Article III standing.  ECF 46 at 22-26.  Standing is a doctrine rooted in the traditional understanding of an Article III "case or controversy."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  Standing consists of three elements: "the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  The burden is on the plaintiff to establish these elements.  *Id.*

Injury in fact is the "first and foremost" of standing's three elements. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998). To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). Importantly, "[i]n a class action matter, we analyze standing based on the allegations of personal injury made by the named plaintiffs." *Dreher v. Experian Info. Solutions, Inc.*, 856 F.3d 337, 343 (4th Cir. 2017); *see also Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) ("The strictures of Article III standing are no less important in the context of class actions.").

Since *Spokeo*, it is clear that a plaintiff may not satisfy the strictures of Article III by alleging "a bare procedural violation." 136 S. Ct. at 1549. Rather, plaintiffs must have suffered a concrete harm as a result of the "defendant's statutory violation that is the type of harm Congress sought to prevent when it enacted the statute." *Baehr*, 953 F.3d at 253 (quoting *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 240-41 (4th Cir. 2019)). The Fourth Circuit has explained, that under RESPA, "the deprivation of impartial and fair competition between settlement services providers" is not the kind of harm Congress sought to prevent and, thus, will not confer Article III standing. *Id.* at 254. Rather, "the harm it sought to prevent is the increased costs . . . for settlement services." *Id.* (holding that deprivation of fair competition "untethered from any evidence that the deprivation increased settlement costs — is not a concrete injury under RESPA"); *see also Edmondson v. Eagle Bank*, Civil Case No. SAG-16-3938, 2020 WL 3128955, at *3 (D. Md. June 12, 2020).

TFSB correctly argues that that Plaintiffs cannot establish standing by alleging a deprivation of "impartial and fair competition" alone. ECF 46 at 21. However, Plaintiffs have

also presented an additional injury, specifically, that they "paid more for their settlement services" as a result of the kickback scheme between Genuine Title and TFSB.  ECF 1 ¶ 62.

TFSB argues that that any kickback arrangement with Genuine Title did not affect borrowers' fees.  ECF 46 at 22.  TFSB points to Zukerberg's deposition testimony in which he stated that the costs simply "came out of [Genuine Title's] profits," ECF 46-1 at 38:4, and, so, Genuine Title, and not its customers, bore any cost of the kickback scheme.  TFSB also points to a recent affidavit from Zukerberg, which states that Genuine Title's charges "were consistent with competitors' charges for the costs of title and settlement services" and "never overcharge[s]."  ECF 46-20 at ¶ 14.

Plaintiffs, on the other hand, contend that Zukerberg's previous statements show that even if its fees were not "gross" overcharges, Genuine Title would have charged lower rates absent the kickback arrangement.  ECF 47 at 3-4.  Although Zukerberg stated that he believed Genuine Title's rates were "competitive" with other title companies, ECF 47-2 at 70:7-8, he also admitted that he, "like any other business tried to get top dollar for your fee," *id.* at 68:1-5.  He testified that he would have preferred "to give the borrower back a couple extra hundred dollars instead of paying it to them [those with whom Genuine Title had kickback agreements]."  *Id.* at 70:3-8.

In arguing that Genuine Title would have charged them a lower fee, had it not been accounting for its kickback payments, Plaintiffs have alleged more than a bare statutory violation.[1] *See Donaldson v. Primary Residential Mortgage, Inc.*, No. ELH-19-1175, 2020 WL 3184089, at *19 (D. Md. June 12, 2020) (holding that plaintiffs' claim that they paid higher prices because of a kickback arrangement giving rise to a RESPA violation alleged a concrete injury). Indeed, Plaintiffs have also presented additional, corroborating evidence indicating that they may have been significantly overcharged. According to his HUD-1 form, Baugh paid $500 for his title examination fee and $500 for his title abstract fee. ECF 47-5. Based on data from the Department of Housing and Urban development, these fees were more than three times the average rate and more than double the eightieth percentile fees in 2010 in Maryland, a state with some of the highest fees in the country. ECF 47-4. Although the HUD data were from 2010 and Baugh's loan closed in 2013, the disparity of Baugh's fee is still significant, and provides additional support for his claim that he suffered a concrete financial injury.

The Court expresses no view at this time as to whether Baugh or any of the putative class members were actually overcharged for services rendered by Genuine Title. The Court merely concludes that at this stage of the proceedings, Plaintiffs have proffered enough evidence to meet the requirements of Article III standing. As more factual development occurs, it may become clear

---

[1] TFSB contends that Plaintiffs must not only show an overcharge, but also that the overcharge lacked a "reasonable relationship to the market value." ECF 46 at 22. TFSB's reliance on *Walls v. Sierra Pacific Mortgage Co.*, GLR-19-00595, 2020 WL 1528626 (D. Md. Mar. 31, 2020), however, is misplaced. In *Walls*, plaintiffs' RESPA claims were dismissed because they did not allege that the payments charged were unreasonable. However, in that case, the court was applying the 12 U.S.C. § 2607(c) safe harbor provision, which provides that "a payment of a fee . . . for services actually performed" is not a RESPA violation, so long as such fees "bear[] a reasonable relationship to the market value of the services performed." *Walls*, 2020 WL 1528626 at *6 (quoting *PHH Corp. v. CFPB*, 839 F.3d 1, 41 n.22 (D.C. Cir. 2016)). That statutory provision is not at issue in this dispute and has no bearing on Plaintiffs' standing.

that Plaintiffs were not overcharged for title and settlement services.  Accordingly, TFSB may continue to challenge Plaintiffs' Article III standing as this litigation proceeds, particularly at the summary judgment stage.  *See Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019) (explaining that the elements of standing must be supported "with the manner and degree of evidence required at the successive stages of the litigation").

### B.  Evidentiary Issues

Plaintiffs bear the burden of establishing that the requirements of Rule 23 are met "through evidentiary proof."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  TFSB contends that Plaintiffs have failed to meet this burden because they have not offered sufficient evidence.  ECF 46 at 16-20.  Specifically, TFSB argues that deposition testimony of Jay Zukerberg and Brandon Glickstein, the principals of Genuine Title, should not be considered because the testimony "would be inadmissible under Fed. R. Civ. P. 23."  *Id.* at 18.  Federal Rule of Civil Procedure 32 prohibits use of depositions "[a]t a trial or hearing" against a party that was not "present or represented" at the deposition or had no "reasonable notice of it."  F. R. Civ. P. 32.  However, many courts have rejected the notion that depositions that would otherwise violate Rule 32 should be wholly barred from court's consideration "at a hearing or proceeding at which evidence in affidavit form is admissible," including class certification hearings.  *Palm Bay Imports, Inc. v. Miron*, 55 F. App'x 52, 56 (3d Cir. 2003) (alteration in original) (quoting *Tormo v. Yormark*, 398 F. Supp. 1159, 1168-69 (D.N.J. 1975)); *see also Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 768 (8th Cir. 1992) (relying on a deposition that was inadmissible at trial to deny summary judgment); *Hoover v. Switlik Parachute Co.*, 663 F.2d 964, 966-67 (9th Cir. 1981) (finding depositions from separate cases "were the equivalent of affidavits" and appropriate for the court to consider at summary judgment); *Goodman v. Platinum Condo. Dev. Corp.*, No. 2:09-CV-00957-KJD-RJJ, 2011 WL 3893915, at *1 (D. Nv. Sept. 2, 2011) (denying motion to strike deposition testimony that did not

comply with Rule 32 from class certification motion); 8A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2142 ("Indeed, depositions can be used more freely on motions than the rule would seem to indicate.").  More simply, Rule 32 "governs when a deposition may be used in lieu of live testimony," and does not govern when a deposition may be used "in support of a written motion." *Combs v. Cordish Cos., Inc.*, No. 14-0227-CV-W-ODS, 2015 WL 438050, at *2 (W.D. Mo. Feb. 3, 2015) (considering deposition from a separate case in a class certification proceeding).

Depositions of Glickstein and Zukerberg, though conducted outside the presence of and without notice to TFSB, constitute sworn testimony that is at least as reliable as the content of affidavits.  Both forms of evidence do not permit cross-examination by the opposing party, and that fact is considered by the Court in determining the weight to be accorded the evidence.  Like affiants, Glickstein and Zukerberg could be called to testify to the facts they described at their depositions at a future trial.  Thus, their prior deposition testimony is considered in conjunction with this Motion.

TFSB also asserts that affidavits of Zukerberg offered by Plaintiffs are "completely lacking in foundation." ECF 46 at 18.  Indeed, at least one district court in the Fourth Circuit has failed to consider an affidavit offered in support of class certification where it was clear that the affiant lacked personal knowledge. *Scoutter v. Equifax Info. Srvs. LLC*, 299 F.R.D. 126, 131 (E.D. Va. 2014) (granting motion to strike affidavit).  In *Scoutter*, the affiant admitted that he did not have personal knowledge of the facts in his sworn affidavit, but argued his personal knowledge was not required, because he was offering testimony as a witness for a corporation. *Id.* at 131.  The court rejected the argument, and struck the affidavit from the record because the affiant (1) admitted in a deposition that he did not have personal knowledge of the matters in his sworn affidavit and (2)

"did not tell the truth" when he signed the affidavit because he swore the testimony was based on personal knowledge, but later testified that it was not. *Id.* at 133. Under these circumstances, the court easily concluded that the affidavit was so unreliable that it should not be considered at all. *Id.*

TFSB's critiques of Zukerberg's affidavits are far less persuasive. Zukerberg testified that counsel drafted his 2016 affidavit in its entirety. ECF 46-4 at 68:14-69:9. But he never testified that his affidavit contained any untrue information or statements not based on his personal knowledge. In his 2017 affidavit, Zukerberg describes a kickback agreement between Genuine Title and TFSB, and specific marketing credits given to Chris Infantino in exchange for referrals. ECF 37-11. TFSB claims Zukerberg did not have personal knowledge of the agreement or payments, because previous deposition testimony indicates that Glickstein primarily dealt directly with Infantino, and that Zukerberg never met him. ECF 1-6 at 132:17-21 to 133:11 (stating Glickstein "was responsible for managing [the] relationship"). This conclusion, however, ignores the fact that Zukerberg's affidavit is consistent with his previous deposition testimony regarding Genuine Title's agreement with TFSB and with Chris Infantino's branch specifically. *E.g.*, ECF 47-1 at 133: 1-17. Additionally, it is not implausible for the president of a small company to have personal knowledge of the company's agreements, even if he was not the primary point of contact. Therefore, Zukerberg's affidavits do not present the kind of flagrant reliability concerns evident in *Scoutter*. The Court will consider Zukerberg's affidavits in conjunction with the other evidence presented and will weigh their persuasiveness accordingly.

### C. Class Certification

Plaintiffs have moved to certify a class under Rule 23(b)(3), in which "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). As a result, Rule 23(b)(3) class actions "must

meet predominance and superiority requirements not imposed on other kinds of class actions." *Gunnells*, 348 F.3d at 424. Importantly, "[i]n a class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(a)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over other questions.'" *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997)). Thus, the Court analyzes predominance and commonality together, and will begin with that inquiry before returning to the remaining requirements of Rule 23(a). *See, e.g.*, *Romeo v. Antero Resources Corp.*, No. 1:17CV88, 2020 WL 1430468, at *8 (N.D. W. Va. Mar. 23, 2020) ("[T]he Court will consider commonality in its discussion of predominance.").

### 1. Rule 23(b)(3)

#### a. Predominance of Common Questions

To satisfy predominance, common questions must have significant "bearing on the central issue in the litigation." *EQT*, 764 F.3d at 366. In other words, the requirement is met where all class members' claims "depend upon a common contention," and establishing "its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Here, the essence of each proposed class member's claim against TFSB is that TFSB referred them to Genuine Title for settlement services because Genuine Title promised to, and actually did, provide something of value to TFSB in accordance with a prior common agreement. Specifically, Plaintiffs have presented evidence of two common schemes: (1) an agreement between Genuine Title and TFSB branch managers, including Chris Infantino, in which Genuine Title provided marketing credits in exchange for each referral, and (2) an agreement between Genuine Title and TFSB, in which Genuine Title paid $175 for each referral.

Whether these kickback agreements existed and, if so, how they were executed are common questions to each class member "at the heart of the litigation." *See EQT*, 764 F.3d at 366. Other common questions, critical to all proposed class members' claims, include (1) whether failing to identify kickback payments on Plaintiffs' HUD-1 forms constitutes fraudulent concealment to trigger equitable tolling, and (2) whether TFSB ever told its customers about its referral agreement with Genuine Title.

TFSB argues that despite these common questions, individual inquiries will predominate. ECF 46 at 30-34. First, TFSB argues that the Court will be drawn into separate analyses of whether each class member has standing. However, as discussed above, individual inquiries into whether each fee was reasonable relative to the market rate are not necessary to establish a concrete injury. Plaintiffs need only establish that Genuine Title charged class members higher fees than it would have absent a kickback arrangement.

Next, TFSB argues that each loan processed subject to the TSA will require individual inquiries into what services were actually performed by TFSB in exchange for the $175 fee charged to Genuine Title. In cases cited by TFSB where the court concluded a "transaction-by-transaction" analysis was necessary, plaintiffs conceded that the defendants had performed compensable services, and the question was whether the payments for the services were reasonable. *See e.g.*, *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 741-42 (5th Cir. 2003) (explaining that where plaintiffs admitted that a law firm provided some document preparation services for a flat fee, individual inquiries were required to determine if the fee was reasonable for each transaction); *Glover v. Standard Fed. Bank*, 283 F.3d 953, 966 (8th Cir. 2002) (finding a loan-specific analysis was required where plaintiffs' claims were based on payment of yield spread premiums not reasonably related to the services performed); *LaCasse v. Wash. Mut.*,

*Inc.*, 198 F. Supp. 2d 1255 (W.D. Wash. 2002) (finding analysis of individual yield spread premium payments were necessary to determine whether the fee was related to the "kind or amount of work" performed by the broker).   Unlike in these cases, Plaintiffs are not asserting that some unspecified portion of the fee paid to TFSB was a kickback.   They are claiming that the entire payment was a kickback, and that no services were ever performed based on the TSA to earn any portion of the fee. Zukerberg has consistently testified that TFSB did not perform any of the tasks specified in the TSA, and that the TSA was indeed a "sham." ECF 37-2 at 149-150; ECF 37-11 at ¶¶ 8-11.   TFSB disputes Zukerberg's testimony, and claims that TFSB did perform under the agreement.   To support its claim, TFSB has produced statements from TFSB employees explaining that the services outlined in the TSA are regularly conducted by TFSB and were actually conducted in every loan transaction, including the loans serviced by Genuine Title.   ECF 46-11 to ECF 46-19.   This defense goes to the merits of Plaintiffs' claims, but does not destroy predominance.   Even if TFSB presents some evidence relating to services performed for particular loans, Plaintiffs may still establish by common proof that the TSA was not intended to create a fee arrangement for TFSB's services, but was created solely to conceal the kickback agreement.

Additionally, TFSB argues that proving plaintiffs' claims will require individual inquiries into loans executed prior to the TSA, to determine whether marketing credits were actually issued in exchange.   ECF 46 at 33-34.   However, as this Court has explained in other opinions, where plaintiffs have sufficiently alleged a common scheme, "[m]inor variations to the scheme's implementation in some aspects – such as the identity of the branch manager making the referrals, or the form of the kickback given in exchange for the referral – are not issues that predominate the common existence of the alleged kickback scheme." *James v. Acre Mortg. & Fin., Inc.*, Civil Case No. SAG-17-1734, 2020 WL 2848122 at *7 (June 2, 2020) (citing *Palombaro v. Emery Fed.*

14

*Credit Union*, No. 1:15-cv-792, 2017 WL 3437559, at \*11-12 (S.D. Ohio Aug. 10, 2017); *Fangman v. Genuine Title, LLC*, No. RDB-14-0081, 2016 WL 6600509, at \*9 (D. Md. Nov. 8, 2016)).  TFSB may ultimately prove that a common agreement did not exist, or was not as pervasive as alleged, but determining the basic existence of an agreement will be central to each class member's claim.

This litigation thus turns on common issues of law and fact, and therefore, Plaintiffs have satisfied the predominance requirement of Rule 23(b) and the related commonality requirement of Rule 23(a).

<u>Superiority</u>

In addition to finding that common questions predominate under Rule 23(b), the Court finds that the class action vehicle is "superior to other methods" of adjudicating this controversy. *See* Fed. R. Civ. P. 23(b)(3).  Based upon the common questions that predominate, as explained above, a class action is more efficient than allowing potentially hundreds of individual claims arising from this purported kickback arrangement.

**2. Rule 23(a)**

<u>Typicality</u>

The typicality requirement in Rule 23 requires that "claims or defenses of representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  This prerequisite "goes to the heart of a representative parties' [sic] ability to represent a class." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006).  For that reason, the "plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim." *Id.*  The representative plaintiff's claims "need not be 'perfectly identical or perfectly aligned'" with other class members' claims, but "the

representative's pursuit of his own interests 'must simultaneously tend to advance the interests of the absent class members.'" *Ealy v. Pinkerton Gov't Servs. Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013) (unpublished) (quoting *Deiter*, 463 F.3d at 466).  This analysis "tend[s] to merge" with the adequacy.  *See Broussard*, 155 F.3d at 337 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n. 13 (1982)).

As discussed above, Plaintiffs have presented evidence of essentially two kickback schemes between Genuine Title and TFSB.  The first involved giving marketing credits to branch managers.  The latter involved making payments directly to TFSB pursuant to a "sham" TSA. Plaintiffs characterize the second scheme as merely an "expan[sion]" of the kickback agreement already in existence.  ECF 47 at 7.  However, the evidence presented shows the execution to be significantly different, such that the validity of claims arising from transactions subject to the TSA may diverge from those arising from transactions entered into prior to the TSA.  Plaintiff Baugh's loan was processed in March of 2013, prior to the TSA's existence.  Plaintiff Frazier's loan was processed in September of 2013, and was presumably subject to the TSA.  Frazier, however, has withdrawn from her representation of the class.  *See* ECF 46 at 1 n. 1.  Proof of Baugh's claim will likely still "advance the interests," to some extent, of the class members whose loans were subject to the TSA.  *See Ealy*, 514 F. App'x at 305.  However, proving Baugh's case will not involve proving or disproving whether any services were rendered pursuant to the TSA, which could determine whether a RESPA violation occurred.  Because it is possible, for example, that the marketing credits might prove to be a RESPA violation but the TSA payments might not, or vice versa, a class representative from each group (pre- and post-TSA) is needed to ensure that all class members' claims are fairly represented.  *See Broussard*, 155 F.3d at 340 (explaining typicality exists where "as goes the claim of the named plaintiff, so go the claims of the class") (quoting

*Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998)).  Baugh meets the typicality requirement for class members who closed their loan prior to May 22, 2013, when the TSA was executed, but cannot fulfill the Rule 23(a) typicality requirement for the remainder of the class whose loans closed after that date.

> Adequate Representation

Finally, Plaintiffs must illustrate that they will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  Because, as of June 26, 2020, Penny Frazier has declined to pursue her status as class representative, she is clearly not adequate to fill the role.  Baugh, however, has continued his involvement in the case.  TFSB argues that Baugh is an inadequate representative because he lacks independent knowledge about his claim.  ECF 46 at 20.  However, the Fourth Circuit has recognized that a plaintiff "need not have extensive knowledge of the facts of the case in order to be an adequate representative," particularly in a "complex case." *Gunnells*, 348 F.3d at 430.  That Baugh has relied on counsel to understand the intricacies of the RESPA statute and his potential relief does not convince the Court that he will fail to vigorously represent the class.  The Court also notes that Baugh attended the telephonic hearing on this motion to certify the class, demonstrating active involvement in the case.

Baugh is an adequate representative for those class members whose loans were closed prior to the TSA.  However, as discussed in the analysis of the typicality requirement, Baugh's rigorous pursuit of his own claim may not sufficiently carry the claims for plaintiffs whose loans closed after the TSA was executed.  In their Reply, Plaintiffs proposed William Johnson, a putative class member whose loan was completed after the TSA, as a substitute for Frazier.  ECF 47 at 11.  At the class certification hearing, however, Plaintiffs' counsel stated that Williams was no longer available to serve as a class representative, but assured the Court that they could readily find

17

another adequate substitute. Plaintiffs, however, have not filed a motion to substitute a new representative. Therefore, there is no adequate representative for the class members whose claims arose after the TSA.

In regards to the adequacy of class counsel, the Court concludes that Plaintiffs' counsel, which is largely the same counsel for the class certified in *Dobbins v. Bank of America*, Civil Case No. SAG-17-0540, 2020 WL 5095855, at *1 (Aug. 28, 2020); *Edmondson*, 2020 WL 3128955, *James*, 2020 WL 2848122, and *Fangman*, 2016 WL 6600509, will adequately represent the entire proposed class.

Numerosity

Plaintiffs have identified over one thousand loans that meet the objective class criteria, and TFSB does not dispute that the numerosity requirement is met. Over six hundred of these loans were obtained prior to execution of the TSA. ECF 47 at 10. The Court finds that there are sufficiently numerous proposed class members, even as to a narrower class of borrowers whose loans pre-date the TSA.

**D. Narrowing the Class Definition**

Plaintiffs have met the Rule 23 requirements for certification of a narrowed class of Plaintiffs—those whose loans were obtained prior to TFSB executing the TSA with Genuine Title. The named class representative, Baugh, cannot adequately represent the remainder of the proposed class. As noted above, at oral argument, Plaintiffs' counsel stated that a number of proposed class members who obtained loans through TFSB after the TSA could easily replace Frazier to serve as a class representative. TFSB also stated that it would not object to Plaintiffs replacing Frazier with a new class representative. Accordingly, the Court will certify a Class represented by Baugh, and will deny certification of the remaining proposed class members, without prejudice. *See Karnuth*

18

*v. Rodale, Inc.*, No. Civ.A. 03-742, 2005 WL 747251, at *4 (E.D. Pa. Mar. 30, 2005) (denying certification without prejudice where plaintiffs' counsel stated they "would have no difficulty substituting another individual" for the inadequate class representative).  Plaintiffs' counsel will be afforded a limited window in which to seek a substitute class representative who can adequately represent the post-TSA borrowers.  If they do so, they will be permitted to renew their Motion to Certify the Class.  If both events occur, the Court will determine if certification of the originally proposed Class, with the newly added class representative, is appropriate, and whether the entire Class, if certified, should be divided formally into two subclasses representing the two groups of claims.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' Motion to Certify Class, ECF 37, is GRANTED in part.  The Class definition will be narrowed to borrowers who obtained loans between January 1, 2009 and May 22, 2013, when the TSA was executed.  Certification of the remainder of the proposed Class is DENIED without prejudice.

Dated:  September 25, 2020

_____ /s/ _____
Stephanie A. Gallagher
United States District Judge
