IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| D'ALAN E. BAUGH, *et al.*, | * | |
| Plaintiff, | * | |
| v. | * | Civil No. SAG-17-1735 |
| THE FEDERAL SAVINGS BANK, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

D'Alan E. Baugh, William and Sharon Johnson, and Michael and Jane Walsh represent a class of borrowers (collectively, the "Plaintiffs") who had a federally related loan brokered by Defendant The Federal Savings Bank ("TFSB"). Plaintiffs assert that TFSB violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601–17, by referring loans to a title services provider, Genuine Title, in exchange for kickbacks. TFSB has filed a motion to decertify the class. This Court has reviewed the parties' briefing and the exhibits attached thereto. *See* ECF 117, 118, 126. A hearing was held on September 14, 2023. For the reasons below, TFSB's motion to decertify the class, ECF 117, will be denied.

### I.  FACTUAL BACKGROUND

Plaintiffs essentially allege two types of kickbacks that Genuine Title paid TFSB in exchange for TFSB's referral of loans to Genuine Title. The first involves giving marketing credits to branch managers, and the second involves making payments directly to TFSB pursuant to a "sham" Title Services Agreement (TSA). These different schemes lay the foundation for two subclasses of Plaintiffs: Borrowers who closed their loans on or before May 23, 2013, the signing

of the TSA ("Subclass 1"), and borrowers who closed their loans after the signing of the TSA ("Subclass 2").

D'Alan E. Baugh represents the Plaintiffs in Subclass 1. Because another representative, Penny Frazier, withdrew from the class, this Court initially granted class certification for Subclass 1 and denied certification for Subclass 2 without prejudice. *Baugh v. Fed. Sav. Bank*, 337 F.R.D. 100, 108 (D. Md. 2020); ECF 55. Months later, Plaintiffs found replacements for Frazier, and this Court granted class certification for Subclass 2, with William and Sharon Johnson and Michael and Jane Walsh as named Plaintiffs. *Baugh v. Fed. Sav. Bank*, No. 17-CV-1735, 2020 WL 7074589, at *3 (D. Md. Dec. 3, 2020); ECF 130.

The parties have completed discovery, which includes the testimony of multiple fact and expert witnesses. Plaintiffs particularly rely on testimony and declarations from two Genuine Title employees. Jay Zukerberg, the former president, stated that Genuine Title had an agreement with Chris Infantino, a TFSB branch manager, whereby Genuine Title paid TFSB marketing credits in exchange for referral of borrowers to Genuine Title. ECF 118-1 ¶ 5. Zukerberg explained that Genuine Title and TFSB later entered into the TSA, which stated that TFSB would provide services to Genuine Title in the settlement of loans. *Id.* ¶ 8. He asserted that TFSB did not actually provide such services, yet Genuine Title paid $175 per settled loan. *Id.* He declared that this payment "was baked into the charges paid by the borrowers in their closing costs," such that had TFSB "not required Genuine Title to sign the [TSA] and pay the $175 to FSB, Genuine Title would have been willing to charge the borrower $175 less on the closing." ECF 118-9 at 3.

Brandon Glickstein, another Genuine Title employee, testified in another case that he was the point of contact for TFSB. ECF 118-3 at 100:4–6. He explained that a kickback agreement would have affected the pricing negotiation between Genuine Title and its lender. *Id.* at 157:5–14.

2

He also stated that the paying of marketing credits was a "regular business practice of Genuine Title in order to obtain market share." ECF 118-5 at 93:17–94:5. He specified that between 2009 and 2014, 90% of his business involved "either a marketing credit or leads…or money going to [the] referral source." ECF 118-3 at 43:4–44:2.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 23(c)(1)(C) provides that "an order that grants or denies class certification may be altered or amended before final Judgment." "Indeed, 'an order certifying a class must be reversed if it becomes apparent, at any time during the pendency of the proceeding, that class treatment of the action is inappropriate.'" *Minter v. Wells Fargo Bank, N.A.*, No. 07-CV-3442, 2013 WL 1795564, *2 (D. Md. Apr. 26, 2013) (quoting *Stott v. Haworth*, 916 F.2d 134, 139 (4th Cir.1990)). However, "commentators have cautioned that courts should be wary of motions to decertify which simply reargue certification 'in the absence of materially changed or clarified circumstances.'" *Id*. (quoting 3 Newberg on Class Actions § 7:47 (4th ed. 2012) (alteration adopted)).

"[A] motion to decertify is reviewed against the same standards as a motion to certify (i.e., the requirements of Rule 23)." *Id*. at *3 (citing *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 544 (E.D. Va. 2000)). Specifically, Rule 23(a) requires that (1) the alleged class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the representatives' claims are typical of the claims of the class, and (4) the representatives will fairly and adequately protect the interests of the class. After satisfying the Rule 23(a) prerequisites, the plaintiffs must show that the proposed class action satisfies one of the enumerated conditions in Rule 23(b). *E.g.*, *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003). Here, Plaintiffs sought and were granted class certification pursuant to Rule

23(b)(3). Under that rule, a class may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### III. ANALYSIS

TFSB argues that Plaintiffs no longer satisfy the predominance requirement of Rule 23(b)(3). The predominance requirement tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004). "A common question is one that can be resolved for each class member in a single hearing" rather than one that "turns on a consideration of the individual circumstances of each class member." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006). Common questions must have a significant "bearing on the central issue in the litigation." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 366 (4th Cir. 2014).

This Court initially granted class certification because common questions—whether kickback agreements existed and, if so, how they were executed—existed for all class members and had a significant bearing on the central issue in the litigation. Almost three years later, these same common questions lie "at the heart of the litigation." *EQT Prod. Co.*, 764 F.3d at 366. But TFSB now argues that common questions no longer predominate because individualized analyses will be required to prove standing for each class member. In support of its argument, TFSB relies on a recent Supreme Court holding that all class members must have Article III standing to recover damages. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). Plaintiffs respond that despite *TransUnion*, "common liability issues are sufficient on their own to establish predominance." ECF 118 at 9.

Both parties overstate the law. On one hand, TFSB construes *TransUnion* to mean that every class member must have Article III standing *at the class certification stage*. Not quite. The Supreme Court expressly declined to address the "distinct question" of "whether every class member must demonstrate standing *before* a court certifies a class," *TransUnion*, 141 S. Ct. at 2208 n.4, and the Fourth Circuit has similarly declined to weigh in, *see Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 652, 659 (4th Cir. 2019) ("The question of how best to handle uninjured class members has led to well-reasoned opinions from our sister circuits…. A litigated case is not a symposium, however, and whatever views we may have on these issues must be left for another day.").

On the other hand, Plaintiffs suggest that Article III standing plays virtually no role in the predominance inquiry when common questions of liability persist. Not quite. Standing is "an indispensable part of the plaintiff's case" and must be supported "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At a minimum, *TransUnion* requires every class member to have standing at trial. *TransUnion*, 141 S. Ct. at 2208. Given that the parties have completed discovery, it is appropriate again to consider the class members' standing in this motion for decertification. In fact, this Court has previously analyzed the effect of class members' standing on the predominance inquiry when deciding a motion for decertification. *See Edmondson v. Eagle Nat'l Bank*, No. 16-CV-3938, 2023 WL 5336994, at *13 (D. Md. Aug. 18, 2023).

TFSB argues that Plaintiffs cannot establish class members' standing without individualized analyses that defeat the predominance of common questions. Article III standing requires a showing that Plaintiffs have suffered an injury-in-fact. *Lujan*, 504 U.S. at 560. Injury-in-fact in the RESPA context constitutes "increased settlement costs" that "tend to result

from kickbacks' interference with the market for settlement services." *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 254 (4th Cir. 2020) (internal marks omitted). Put differently, Plaintiffs must show that they were overcharged for settlement services as a result of kickbacks. TFSB characterizes Plaintiffs' evidence of overcharge as individualized inquiries that overcome the predominance of common questions.

This court disagrees with TFSB's characterization. Plaintiffs offer sworn testimony about overcharge that, if repeated at trial, can be commonly assessed across all class members. For instance, the former president of Genuine Title, Jay Zukerberg, submitted a declaration that "the $175 paid to [TFSB under the TSA]…was baked into the charges paid by the borrowers in their closing costs." ECF 118-9 at 3. He added that had TFSB "not required Genuine Title to sign the [TSA] and pay the $175 to FSB, Genuine Title would have been willing to charge the borrower $175 less on the closing." *Id.* Such testimony is direct evidence that Plaintiffs in Subclass 2 were charged $175 in higher fees due to the kickbacks.[1]

The overcharge of Subclass 1 members can also be established if the jury credits other testimony. Brandon Glickstein, another employee of Genuine Title, testified in a prior case that a kickback agreement would affect the pricing negotiation between Genuine Title and its lender

---

[1] TFSB contends that proof of the $175 kickback invokes "circular" logic and does not prove an overcharge. ECF 117-1 at 25–26. More specifically, at the motions hearing, TFSB's counsel referenced Glickstein's testimony that Genuine Title's "average cost was about [$]900 plus title," and explained that any charge below that number is not an overcharge, even if a kickback is baked into the charge. Mot. Hr'g Ex. E. Plaintiffs dispute this $900 threshold and assert that, to have standing to sue, they only need to show that they were charged higher settlement costs than they would have been charged absent the RESPA violation. Plaintiffs are correct. *See, e.g.*, *Wilson v. Eagle Nat'l Bank*, No. 20-CV-01344, 2023 WL 2478933, at *7 (D. Md. Mar. 13, 2023) (holding that plaintiffs alleged overcharge by arguing that defendant "boosted its fees to offset a kickback"); *Bezek v. First Mariner Bank*, No. 17-CV-2902, 2020 WL 5877159 at *4 (D. Md. Oct. 2, 2020) (holding that plaintiffs alleged overcharge by arguing that defendant "would have charged them a lower fee had it not been accounting for the kickback agreement").

because a loan officer who was not paid kickbacks would typically be "less tolerant of higher fees." ECF 118-3 at 157:5–14. And Brett Dieck, Plaintiffs' expert witness, opined that "Genuine Title was in fact charging increased title services fees and title insurance rates to increase revenue and to offset the costs of kickbacks that were being paid to TFSB."[2] ECF 117-2 at 4.

Of course, the existence of this testimony does not necessarily mean that Plaintiffs will prevail on the class members' standing at trial. The jury may accept or deny, and credit or discount, the testimony by assessing the witnesses' credibility.[3] But because the significance of the testimony can be resolved for all class members "in a single hearing," class certification remains proper. *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006).

TFSB spends much of its briefing on five other theories of overcharge that Plaintiffs appear to rely on, including (1) the denial of discounted reissue rates, (2) the issuance of enhanced lender's policies, (3) charges exceeding the fees on Genuine Title's rate sheet, (4) charges exceeding the $550 fee that another title company charged, and (5) unallowable fees on Veterans Affairs loans. ECF 117-1 at 15–25. This Court declines to opine on these theories because the above testimony can suffice on its own to establish overcharge for all class members.[4] In other

---

[2] TFSB has not sought to exclude Dieck's testimony and, in connection with this motion, has not referenced expert testimony to undermine it. Absent any challenge to its admissibility, this Court declines to undertake its own assessment of the credibility of Dieck's expert opinion at the class certification stage. Instead, it simply notes that Dieck's testimony, if credited by a factfinder, would support Plaintiffs' theory of overcharge for Subclass 1 members.

[3] As this Court referenced at the hearing, at least Zukerberg has made what appears to be entirely contradictory statements in other cases about whether kickback expenses were passed on to loan customers. The credibility questions, therefore, may be significant ones for the factfinders' consideration.

[4] TFSB relies on this Court's recent holding in a related case that "claims involving title insurance are not amenable to class resolution" under the predominance requirement. *Edmondson v. Eagle Nat'l Bank*, No. 16-CV-3938, 2023 WL 5336994, at *13 (D. Md. Aug. 18, 2023). But the plaintiffs in that case did not offer the testimony that Plaintiffs have in this case regarding "baked in" overcharges. Whether this Court would ultimately allow claims limited to title insurance to proceed on a classwide basis is not before this Court in this case.

words, unlike in other cases, Plaintiffs need not and do not rely on the other alternative theories to establish class members' standing. To the extent that Plaintiffs later assert these theories to establish different amounts of *damages* for each Plaintiff or Subclass, such individualized determinations do not currently defeat the predominance of the common liability and standing issues in this case. *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir. 2003) ("The possibility that individualized inquiry into Plaintiffs' damages claims will be required does not defeat the class action because common issues nevertheless predominate.").

## IV.  CONCLUSION

For the foregoing reasons, TFSB's Motion for Decertification, ECF 117, is DENIED. A separate order follows.

Dated: September 20, 2023

                                                                                                           /s/
                                                             Stephanie A. Gallagher
                                                             United States District Judge